No. 17-2373-cr

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

WILLIAM T. WALTERS,

*Defendant-Appellant*.

_____

**MOTION OF DEFENDANT-APPELLANT
FOR BAIL PENDING APPEAL**

Appeal from the United States District Court
for the Southern District of New York, No. 16 Cr. 338
Before the Honorable P. Kevin Castel

Barry H. Berke
Paul H. Schoeman
KRAMER LEVIN NAFTALIS &
FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Alexandra A.E. Shapiro
Eric S. Olney
SHAPIRO ARATO LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant William T. Walters*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT .............................................................1

BACKGROUND ................................................................................3

ARGUMENT ...................................................................................12

   I.    THERE IS A SUBSTANTIAL QUESTION WHETHER WALTERS
       WAS DEPRIVED OF A FAIR TRIAL BY DAVIS' PERJURY .............13

   II.   THERE IS A SUBSTANTIAL QUESTION WHETHER THE
       INDICTMENT SHOULD HAVE BEEN DISMISSED BECAUSE
       OF THE PERVASIVE GRAND JURY LEAKS .....................................19

CONCLUSION ................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
 487 U.S. 250 (1988) ............................................................ 19, 21

*Drake v. Portuondo*,
 553 F.3d 230 (2d Cir. 2009) ......................................... 2, 14, 18

*Jenkins v. Artuz*,
 294 F.3d 284 (2d Cir. 2002) ............................................ 18, 19

*Su v. Filion*,
 335 F.3d 119 (2d Cir. 2003) ....................................... 13, 18, 19

*United States v. Abuhamra*,
 389 F.3d 309 (2d Cir. 2004) ...............................................12

*United States v. Agurs*,
 427 U.S. 97 (1976) ...............................................................13

*United States v. Anderson*,
 61 F.3d 1290 (7th Cir. 1995) ..............................................21

*United States v. Brito*,
 907 F.2d 392, 394 (2d Cir. 1990) ................................. 20, 21

*United States v. Cromitie*,
 727 F.3d 194 (2d Cir. 2013) ...............................................13

*United States v. Eisen*,
 974 F.2d 246 (2d Cir. 1992) ...............................................19

*United States v. Freeman*,
 650 F.3d 673 (7th Cir. 2011) ..............................................18

*United States v. Randell*,
  761 F.2d 122 (2d Cir. 1985) .................................................................. 13, 19, 22

*United States v. Restrepo*,
  547 F. App'x 34 (2d Cir. 2013) ................................................................. 20, 21

*United States v. Wallach*,
  935 F.2d 445 (2d Cir. 1991) ..................................................................... 13

## Statutes and Rules

18 U.S.C. § 3141 ......................................................................................... 1

18 U.S.C. § 3143  ................................................................................... 1, 12

Fed. R. Crim. P. 6 ...................................................................................... 10

Fed. R. App. P. 9 .......................................................................................... 1

Fed. R. App. P. 27 ....................................................................................... 1

Pursuant to Federal Rules of Appellate Procedure 9(b) and 27, and 18 U.S.C. §§ 3141(b) and 3143(b), William T. Walters moves for an order granting bail pending his appeal from his criminal conviction for insider trading offenses following a jury trial before the Honorable P. Kevin Castel. On July 27, 2017, Walters was sentenced principally to 60 months' imprisonment. (Ex. A).[1] Judge Castel denied Walters' motion for bail pending appeal and scheduled a surrender date of October 10, 2017. (Ex. B). Walters filed a notice of appeal on August 1, 2017. (Ex. C).

## PRELIMINARY STATEMENT

The insider trading prosecution of Walters was tainted by flagrant government misconduct that began during the investigation and pervaded the trial. Beginning in 2013, the FBI agent leading the then-"dormant" investigation systematically leaked secret grand jury information to the press in order to revive it. The government does not dispute that this same agent had also leaked confidential information in numerous prior investigations. The FBI and USAO knew early on about the illicit leaking, and described it internally as "deplorable" and "reprehensible." Yet, astonishingly, the government did nothing to identify the leaker or bring him to justice, and instead allowed the leaks to continue. The

---

[1] All cited exhibits are drawn from the record below and attached to the accompanying Declaration of Alexandra A.E. Shapiro.

1

court denied Walters' motion to dismiss the indictment because he supposedly failed to show prejudice. But the leaks kickstarted a "dormant" investigation and played a substantial role in star witness Tom Davis' decision to cooperate against Walters after 21 months of insisting under oath and in interviews that he never tipped Walters.

After using the leaks to flip Davis, the government suborned his perjury. Davis testified at trial that he had repeatedly tipped Walters. But his phone records undermine the government's allegations about when the key tips supposedly occurred. So Davis fabricated a story that he tipped Walters using a prepaid "burner" cell phone. The government spent months trying to corroborate this story, without success. But it elicited his perjured testimony about the cell phone anyway, because it was critical to the prosecution.

"[R]eversal is virtually automatic" where, as here, "the government knowingly permitted the introduction of false testimony." *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (internal quotations omitted). Walters therefore raises a substantial issue as to whether the district court erred by refusing to grant him a new trial. The grand jury leaks also raise two substantial issues for the appeal: whether they prejudiced Walters (they clearly did), and whether Walters is required to show prejudice at all (he is not).

This Court should grant bail pending appeal.

2

## BACKGROUND

1.    <u>Overview</u>.  Walters is a self-made businessman who overcame poverty and a difficult childhood to become a famous, successful professional sports gambler.  In the early 1990s, he began to pursue more traditional forms of investing, and incorporated the Walters Group as the vehicle for his investments and other business activities.  (Tr. 2137-38).[2]  Walters traded in "a range of different stocks" (Tr. 2303), and the banks and brokerage houses Walters used (including Goldman Sachs and JP Morgan) praised his "intellectual" approach and the "extraordinary amount of work" he performed to diligence his investments. (Tr. 2303, 2468).  Through hard work and business acumen, Walters made hundreds of millions of dollars whose legitimacy is unquestioned.  (Tr. 2137-38).

The government's theory was that, as Walters neared retirement age, he risked everything—his freedom, his reputation, and the substantial personal wealth he had amassed through entrepreneurship and decades of legal investing—by committing insider trading.  The principal charges in the case involved trades in Dean Foods, one of the numerous stocks in Walters' portfolio.  Walters carefully and exhaustively researched Dean Foods using public sources, as he did for his other investments.  (*See, e.g.*, Tr. 2338-39, 2385).  Walters' trading in Dean Foods was no different from his trading in other stocks, in terms of the frequency and size

---

[2]    All cited transcript pages are included at Ex. D.

3

of the trades and their overall success. (Tr. 2293, 2326, 2335, 2471, 2484). Although Walters profited overall from trading Dean Foods stock, he lost money on a number of his individual trades. (*See, e.g.*, Tr. 569-72, 2060).

The government alleged that Walters traded on tips he supposedly received from his friend Tom Davis, who sat on Dean Foods' board of directors. The focus of the case and the substantive counts involving Dean Foods stock were allegations that in the summer of 2012, Davis repeatedly tipped Walters about the likelihood and timing of the company's spinoff of its WhiteWave division.[3] (Dkt. 8 ¶¶ 55, 57). However, Davis' testimony about these supposed tips was contradicted by other evidence. Walters' and Davis' phone records show that Walters' 2012 Dean Foods trades frequently did not occur around the time he had a conversation with Davis. (*See, e.g.*, Tr. 2760, 2767). Indeed, when the government asked Davis about these trades in 2014 and 2015, he confirmed during interviews and in SEC testimony that he had never passed confidential information to Walters. (Exs. E-F; Tr. 997, 1001-03).

---

[3]    The indictment alleged a conspiracy lasting from 2008 to 2014, but the "overt acts" listed, and the indictment's substantive counts, related to the WhiteWave spinoff trades occurring between May and October 2012. The other substantive counts involved an alleged tip from Davis about a different company, Darden Restaurants, in 2013, but Davis conceded that he did not tell Walters that he had breached any duty by making this disclosure. (Tr. 887).

4

The government also alleged that Walters traded on tips from Davis in other time periods, but the evidence contradicts these allegations as well. For example, the government claimed that Walters sold Dean Foods shares on May 3, 2010 (a Monday) after Davis allegedly informed him during a call that took place on Sunday, May 2, about the company's poor first quarter earnings. (Dkt. 8 ¶ 23(d)-(e); Tr. 764-65, 1924-25). In fact, Walters placed this sell order with his broker on Friday, April 30, *before* speaking with Davis. (Tr. 2052-53).

Similarly, the government argues that Davis sold Dean Foods stock in February 2013 based on more internal bad news, when in fact correspondence among Walters' advisors confirms that "part of [Walters'] position" in "Dean Foods" was sold to pay for a "house" in California. (Tr. 2636-37; Exs. G-I). Indeed, when these shares were sold, Walters retained most of his Dean Foods holdings (4.4 million shares), which he would not have done had he known the price was about to drop. (*See, e.g.*, Tr. 2636).

2.    The Investigation and Davis' Cooperation and Perjury. The government began investigating Walters' Dean Foods trades in approximately July 2011. By 2013 the government's case had yet to materialize, leading the FBI agent in charge of the investigation, David Chaves, to label it "dormant." (Dkt. 65-1 at 4; *accord* Dkt. 69-1 at 10-12). So Chaves began strategically leaking secret grand jury information to the press, in violation of the law. (Dkt. 65-1 at 4). He was

5

cozy with reporters at the *New York Times* and *Wall Street Journal*, and arranged "lunch" and "dinner[s]" where he leaked the grand jury information. (*Id.* at 4-5). This was not the first time he did this; it was part of an extensive pattern spanning a number of insider trading investigations. (Dkt. 68 at 37-41). Chaves also had a *quid pro quo* with at least one of these reporters whereby, in exchange for the leaks, the reporter provided Chaves leads that assisted the investigation. (Dkt. 65-1 at 5).

The leaks resulted in numerous articles between 2014 and 2015. And there is strong evidence that Chaves was not acting alone, even though only his role has been confirmed. (*See, e.g.*, Dkt. 69-1 at 36-38 (article stating that information supplied to reporter by "*people* briefed on the probe" (emphasis supplied))). Government emails also demonstrate that, by May 2014, the FBI and USAO knew that at least one FBI agent with a specific and aggressive agenda was leaking grand jury secrets to the press. (Dkt. 65-1 at 7). These emails acknowledge how "reprehensible," "deplorable" and "astonishing" it was for an investigator to criminally leak and trade grand jury secrets with reporters. (Dkt. 65-5; Dkt. 65-7). U.S. Attorney Preet Bharara himself characterized the "leaks" as "outrageous." (Dkt. 65-6).

Yet, *nothing was done to identify the leaker or bring him to justice*. Chaves was instead allowed to continue leaking information. At best, the FBI and the

6

USAO turned a blind eye to the "outrageous" criminal undertaking being operated from within the FBI's own ranks.

The last article based on leaks, in August 2015, publicly identified Davis as a target of the FBI's investigation. (Dkt. 68 at 34-35). This humiliating revelation caused him and his "family" to be "hounded by reporters" and resulted in his ouster from the Dean Foods board. (Tr. 1103-04). That further strained Davis' precarious situation. He had always enjoyed a luxurious lifestyle but failed to live within his means, and had committed numerous financial crimes to remain solvent, including tax fraud, insurance fraud, and stealing from a charity he ostensibly supported. (*See, e.g.*, Tr. 1026-30, 1044-45, 1062, 1092). After 21 months of insisting that he never tipped Walters, including in sworn SEC testimony, Davis cut a deal with the government to turn on Walters in early 2016, hoping to avoid prison time. (Tr. 1114-15).

Davis faced a dilemma: how to explain how he supposedly tipped Walters about the crucial WhiteWave spinoff when their 2012 phone records didn't match Walters' trading. So he came up with a convenient solution—a secret "burner" phone that Walters supposedly gave him prior to the 2012 trades to keep their communications about Dean Foods confidential. Davis told the government that they called this secret phone the "Bat Phone." (Tr. 834).

7

The "Bat Phone" Davis insisted he used to tip Walters in 2012 was a figment of Davis' imagination. When the government asked Davis to produce the Bat Phone, he said he had thrown it into a creek. (Tr. 949). Yet when the government sent a team of divers into the creek, the "Bat Phone" wasn't there. (Tr. 1574). There were no incoming calls in Walters' cell phone records associated with the "Bat Phone." Davis said he never re-upped the minutes on the "Bat Phone's" account, without realizing that they would have automatically expired long before most of the alleged tips. (Dkt. 171-1 at 6; Tr. 1611). Davis refused the government's request to wear a wire and record his conversations with Walters, because he knew that if he mentioned a "Bat Phone" to Walters (Tr. 608), Walters would have no idea what he was talking about.[4]

To try to substantiate his story, Davis provided the government with a highly detailed account of a meeting at Dallas' "Love Field" airport when Walters supposedly gave him the "Bat Phone." (Tr. 834, 1352). He identified not only the airport, but the specific terminal where he greeted Walters' private plane, the insignia on the plane's tail, the identity of each passenger, the precise purpose of their trip to Dallas, where in the airport he spoke with them, what they discussed,

---

[4]     Davis also said that Walters told him to refer to Dean Foods using the code word "Dallas Cowboys" when using the Bat Phone. (Tr. 835, 922). But it turned out that it was Davis, a Dallas native, and not Walters, who had always used "Cowboys" as his secret password. (Ex. J).

8

and what the weather was like that day, among other details.  (Tr. 834-36, 1340-42, 1582-83).  Then he claims to have met privately with Walters in the airport parking lot, where Walters allegedly delivered the "Bat Phone."  (Tr. 834).  Davis testified that this meeting happened in "the summer or the fall . . . of 2011," after which he used the Bat Phone "frequently" to provide Walters with "a lot of detailed information about . . . Dean Foods."  (Tr. 605, 836).

The problem with this story is that it cannot be true.  Other than the part about the Bat Phone, these details match perfectly a trip Walters actually made to Dallas.  (*See, e.g.*, Exs. K-M; Tr. 1342-43, 2265-67, 2270-72).  But that trip happened in *December 2012*, *after* Davis supposedly tipped Walters using the "Bat Phone."  (*Id.*).  Davis was certain about the details of this meeting, but did not consider that the meeting date could be pinpointed using cellphone records and flight logs.

In fact, Davis was so sure about the specifics of the meeting in Dallas that the government had Davis take agents to the Love Field parking lot where the exchange supposedly occurred.  (Tr. 1341, 1582-83).  The government obtained records from the airport, the company that supplied Walters with his pilot, and the company that owned Mr. Walters' plane, and searched them for evidence of another possible meeting.  It interviewed Walters' pilot to determine when he flew Walters to Dallas.  (Dkt. 170 at 8).  And it went over Davis' story with Davis

9

himself at numerous proffer sessions and meetings in preparation for trial.  During these sessions, after Davis had already committed to the story about Love Field, the government unsuccessfully tried to posit alternative meetings he might have had with Walters.[5]  (*Id.* at 7).

One after the next, these failed efforts to corroborate the existence of the "Bat Phone" showed only that Davis was lying.  Yet government proceeded to trial anyway with Davis as its star witness.

3.    The Government's Efforts to Cover Up the Grand Jury Leaks.  In September 2016, before the trial, Walters raised suspicions about the FBI's grand jury leaks and moved for a hearing regarding potential violations of Federal Rule of Criminal Procedure 6(e).  (Dkt. 42 at 19).  At the time, the USAO not only knew that an FBI agent was leaking secret grand jury information, but had internally characterized those leaks as "deplorable" and "outrageous."  (Dkt. 65-5; Dkt. 65-6).  Yet, in response to Walters' motion, the USAO falsely claimed that "the source of the information was [*not*] an attorney or agent of the Government."  (Dkt. 43 at 32).  It further denigrated Walters' suspicions as "false," "baseless accusations []] undermined by the facts," and "a fishing expedition."  (*Id.*).  Later, the district

---

[5]    The government also identified calls from a prepaid phone purchased in Las Vegas in November 2012 in Walters' call records.  (Dkt. 171-15; Dkt. 171-17 at 10).  It investigated whether this device was the "Bat Phone," but Davis claimed he didn't recognize the phone's number.  (Dkt. 171-17 at 10).

court described the government's submission as an "artful opposition" that "never disclosed" the USAO's "high level concerns over FBI leaks." (Dkt. 104 at 20).

On November 17, 2016, the district court granted Walters' request for a Rule 6(e) evidentiary hearing. (Dkt. 46). Then, on the eve of the previously scheduled hearing, the government suddenly identified the leaker as Special Agent Chaves, conceded that he had disclosed "significant amount[s] of confidential information relating to the investigation," and assured the district court that Chaves would be thoroughly "investigat[ed]." (Dkt. 104 at 11, 16).

No charges have been filed against Chaves. Nor is it likely that the government has disclosed the full extent of the problem. For example, the government reviewed "thousands of emails and text messages" related to the leaks, but disclosed only *six* of them, and provided no witness statements for the 14 interviews it conduced. (Dkt. 65-1 at 2-3). And this document review covered only a 3-month time period, even though the leaks spanned approximately 2 years. (*Id.* at 2). Nor has the government revealed the specifics of Chaves' misconduct in prior cases, who else was leaking, and how long the USAO has known about all of this. Put simply, the government's leaks problem is likely bigger—perhaps much bigger—than what we already know.

Walters moved to dismiss the indictment based on the government's misconduct and, in the alternative, requested a hearing. The district court denied

11

the motion without even holding the hearing it had previously ordered, asserting that Walters suffered no prejudice.  (Dkt. 104 at 16, 20).

4.     The jury convicted Walters on all ten counts.  Walters moved for a new trial because his conviction was predicated on Davis' false testimony about the "Bat Phone."  The district court denied the motion, concluding that Davis testified truthfully and that any falsity was immaterial or "disclosed."  (Dkt. 191 at 4-6).

## ARGUMENT

A court "shall order" bail pending appeal if it finds (1) "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community," and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial."  18 U.S.C. § 3143(b).  When a defendant meets that standard, "the statute establishes a right to liberty that is not simply discretionary but mandatory."  *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

Because Walters is neither a flight risk nor a danger to the community,[6] he is entitled to bail if he raises a "substantial question of law or fact" that is likely to

---

[6]     (*See* Presentence Investigation Report at 36). Walters has complied with all conditions of his pre- and post-trial release, has no criminal history other than this case, and "otherwise appears to have been a law-abiding citizen." (*Id.* at 9-10, 32, 36).

result in reversal or an order for a new trial. To qualify as "substantial," a question need only be "one of more substance than would be necessary to a finding that it was not frivolous"—in other words, "a 'close' question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (internal quotations omitted). For example, a question that is "novel, which has not been decided by controlling precedent," is a "substantial question." *Id.* (internal quotations omitted).

## I. There Is A Substantial Question Whether Walters Was Deprived Of A Fair Trial By Davis' Perjury

"[A] conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution." *Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003). In determining whether to order a new trial when a witness may have testified falsely, this Court asks "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial." *Id.* at 127; *accord United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013). "False testimony" is "prejudicial" unless there is "no 'reasonable likelihood that [it] could have affected the judgment of the jury.'" *Filion*, 335 F.3d at 127 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *accord United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). "[I]f it is established that the

13

government knowingly permitted the introduction of false testimony, reversal is virtually automatic." *Drake*, 553 F.3d at 241 (internal quotations omitted).

Reversal should be "virtually automatic" here because the government elicited false testimony from its star witness, Tom Davis, about a matter central to the prosecution: the "Bat Phone."

1. Davis simply lied to the jury about the "Bat Phone." With every opportunity to substantiate its existence, Davis instead reinforced his lie. After he claimed to have thrown the "Bat Phone" into a creek, a government diver could not locate it there. Davis refused to wear a wire and recorded private conversations with Walters that would have confirmed the "Bat Phone's" existence if his story had been true. Though he never re-upped the phone's minutes, it is undisputed that they would have automatically expired before the alleged tips. Not a single call from the "Bat Phone" is found in Walter's incoming calls. And, most significantly, Davis provided a highly detailed account of the airport meeting at which he supposedly received the "Bat Phone"—a meeting that indisputably occurred months *after* the alleged tips. Davis fabricated the part of that meeting where Walters gave him the "Bat Phone."

In denying Walters' motion for a new trial, the district court purported to identify another possibility: "that Davis testified accurately that he received the phone from Walters in 2011, and that he misremembered the precise circumstances

14

. . . or mistakenly confused the meeting at which he received the 'bat phone' with a later meeting." (Dkt. 191 at 5-6). But this explanation defies reason. A hypothetical helps explain why: If you met a close friend outside Yankee Stadium, where he unexpectedly handed you a gun with instructions to commit murder, you would not later "misremember" that this meeting happened a year later at Fenway Park. Likewise, if Davis unexpectedly received the infamous "Bat Phone" from his good friend on a golf course, with instructions to commit federal crimes and risk serving time in prison using this device, that is not something Davis would "misremember." He certainly would not "misremember" that the incident occurred one year later in an airport parking lot where the incident could not possibly have occurred—particularly when Davis' recollection of that trip to the airport is otherwise highly detailed and accurate.

The district court also speculated that evidence not introduced at trial theoretically might show that Davis met Walters "at an airport in Dallas on a different date." (Dkt. 191 at 6). This, too, defies reason. As explained above, the government was well aware of the glaring problem with its star witness' testimony. It scoured flight logs and cell phone records in search of evidence of another meeting that could plausibly match Davis' story. The government introduced no such evidence for one simple reason—there is no such evidence.

15

2.  Indeed, all of the government's efforts to corroborate Davis' story instead underscored his dishonesty.  The government searched the creek for the phone, checked Walters' cell phone records, subpoenaed documents detailing the movements of Walters' plane and its pilot, conducted interviews, and tried to posit alternative meetings at which the phone might have been delivered.  These efforts to corroborate the "Bat Phone" failed because the "Bat Phone" story was a lie, and the government knew it.[7]

3.  Rather than jeopardize its case, the government went ahead with Davis' falsified testimony, which was devastating to Walters' defense.  The government readily admits that registered cell phone and other records it subpoenaed revealed "no . . . communications between" Davis and Walters "around key dates relating to Dean Foods."  (Dkt. 179 at 12).  But it was Walters' trading on these dates that formed the basis of the substantive counts against Walters and nearly all of the alleged "overt acts" the indictment identifies in support of the conspiracy.

---

[7]  Davis' ex-wife, Terie, testified that she found a "burgundy" cell phone in their home that supposedly had a call to Walters (Tr. 1835); the government claims this was the "Bat Phone."  But Terie did not say when this occurred, and Davis repeatedly told prosecutors that the "Bat Phone" was "black." (Tr. 933-34).  Moreover, the two possible numbers Terie provided for the burgundy phone were Davis' work numbers, suggesting she may have been confused.  (Tr. 1845-51; Exs. N-O).  Terie further undermined Davis' story by testifying that when the government sent the divers to retrieve the phone, Davis "smirked" and "said they'll never find the phone."  (Tr. 1855-56).

That is why the government emphasized the "Bat Phone" so heavily at trial. During summations, the government admitted that it mostly lacked evidence of communications on "either of the defendant's registered phones." (Tr. 2760). But a "burner" phone is different, the jury was told, because the government "c[a]n't get records" for burner phones. (Tr. 2760). This is what made it "significant" that Walters "gave Tom Davis a burner phone" (Tr. 2755)—it explained how Davis tipped Walters during "the crucial period" in "the summer of 2012." (Tr. 2760). The government argued that the reason Walters wanted to use the "secret phones" was to "hide his access to Davis" from the authorities. (Tr. 2762). The jury was also told that "[p]eople don't use burner phones to have legitimate legal conversations about investments. They use them when they're trying to cover their tracks" (Tr. 2729); that Walters' supposed insistence on using "burner phones" made the "evidence" of his guilt "overwhelming" (Tr. 2758); and that "the information that was being passed over the burner phones" left "no doubt" that Walters was guilty (Tr. 2767). Indeed, the government even argued that use of "burner phones" *by itself* constituted "proof beyond a reasonable doubt" that Walters was guilty. (Tr. 2777).

The government cannot credibly argue, as it must to avoid a new trial, that there is "no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Filion*, 335 F.3d at 127. At a minimum, there is a

17

substantial question whether a new trial is required, because under this Court's precedents it is "virtually automatic" where, as here, the government elicits false testimony. *Drake*, 553 F.3d at 241.

In refusing to grant a new trial, the district court concluded that "[t]he government presented overwhelming circumstantial evidence of Walters' guilt, including trading records and phone records (*i.e.*, not from the 'bat phone')." (Dkt. 191 at 7). But the court failed either to substantiate this conclusion or reconcile it with the government's jury arguments, which confirmed that the "Bat Phone" was essential to its case.

The district court also observed that Walters was able to cross-examine Davis about the "Bat Phone" and discuss it on summation, apparently assuming that would be sufficient to "disclose[]" his perjury. (*Id.* at 8). The court cited no authority to support this assumption, and ignored the binding precedent that refutes it. *See, e.g.*, *Filion*, 335 F.3d at 129 n.5 (perjury was "still quite troublesome" even where defendant "attack[ed] [the witness'] credibility at summation"); *Jenkins v. Artuz*, 294 F.3d 284, 293-94 (2d Cir. 2002) (same where defendant "cross examin[ed]" witness about perjured testimony); *see also United States v. Freeman*, 650 F.3d 673, 681 (7th Cir. 2011) (rejecting "argu[ment] that since [the witness] was cross-examined extensively" about "his false testimony" it "could not have affected the jury"). The prosecutor is obligated to present a "truthful case to the

18

jury, not to win at any cost." *Filion*, 335 F.3d at 126. "When a prosecutor throws his or her weight behind a falsely testifying witness," instead of meeting his constitutional obligation to present a truthful case, that by itself will "affect[] the judgment of the jury." *Jenkins*, 294 F.3d at 295-96.

Thus, Davis' perjury raises, at the very least, a "close" question warranting bail. *Randell*, 761 F.2d at 125.

## II. There Is A Substantial Question Whether The Indictment Should Have Been Dismissed Because Of The Pervasive Grand Jury Leaks

The FBI's longstanding pattern of illegal grand jury leaks, the USAO's years-long complicity in this misconduct, and its obfuscation before the district court provide an independent basis for bail pending appeal. Reversal is warranted where a "breach of grand jury secrecy . . . jeopardize[s] the defendant's right to a fair trial before a petit jury," *United States v. Eisen*, 974 F.2d 246, 260 (2d Cir. 1992), and an indictment should be dismissed where the record demonstrates "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment," *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 259 (1988) (internal quotations omitted). Walters raises substantial issues with respect to both.

As Chaves recognized, the investigation was "dormant" until his strategically placed leaks revived it, which is why he leaked the information in the

19

first place.  (Dkt. 65-1 at 4).  And Davis testified to the devastating effect of the

final article based on leaks in the months leading to his decision to cooperate.  (Tr.

1104-05).  Indeed, the article cost him his board seat at Dean Foods and the income

that went with it, leaving him "unemployed" at a time when he was already

experiencing severe financial problems.  (*Id.*).  In concluding that Walters was not

prejudiced by the leaks, the district court failed to address this prejudice.  (Dkt. 104

at 13-16).

In any event, Walters has shown the kind of "systematic and pervasive

prosecutorial misconduct" for which no prejudice need be shown.  *United States v.*

*Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) (internal quotation marks omitted);

*see also United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) ("systematic and

pervasive" "history of prosecutorial misconduct" may warrant dismissal of the

indictment (internal quotations omitted)).  The egregious and systematic nature of

the FBI's misconduct here clearly raises a substantial question as to whether the

indictment should have been dismissed, and the district court "agree[d] . . . that the

potential for a pattern of leaks is concerning."  (Dkt. 104 at 17).  But it held that

under the Supreme Court's decision in *Bank of Nova Scotia*, defendants alleging

"systematic and pervasive misconduct" must still show prejudice.  (Dkt. 104 at 17-

18).

20

The district court misconstrued *Bank of Nova Scotia*. There, the Supreme Court set forth the harmless error standard for motions to dismiss an indictment for nonconstitutional errors, but "distinguished" such cases from those "in which indictments are dismissed, without a particular assessment of the prejudicial impact of the errors in each case, because the errors are deemed fundamental." *Bank of Nova Scotia*, 487 U.S. at 256. Where the proceedings had been rendered "fundamentally unfair," a "presumption of prejudice" was allowed. *Id.* at 257. Before assessing prejudice in the case at hand, the Court was careful to note that it was not "faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Id.* at 259.

To apply *Bank of Nova Scotia*'s harmless error standard to instances of "systematic and pervasive" misconduct would render the distinction that the Supreme Court drew superfluous. This Court has thus twice acknowledged "systematic and pervasive" misconduct as a separate basis for dismissal, and has never suggested that prejudice was required. *See Restrepo*, 547 F. App'x at 44; *Brito*, 907 F.2d at 394; *see also, e.g.*, *United States v. Anderson*, 61 F.3d 1290, 1296 n.4 (7th Cir. 1995) ("[P]rejudice need not be shown when 'the structural protections of the grand jury have been so compromised as to render the

21

proceedings fundamentally unfair . . . .'"). The district court offered no reason to depart from this precedent, and its failure to do so raises at least a "novel" and thus substantial question. *Randell*, 761 F.2d at 125.

## CONCLUSION

For the foregoing reasons, Walters should be granted bail pending appeal.

Dated:  New York, New York
       August 15, 2017

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Eric S. Olney
SHAPIRO ARATO LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

Barry H. Berke
Paul H. Schoeman
KRAMER LEVIN NAFTALIS &
FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Appellant William T. Walters*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,130 words.

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

Date: August 15, 2017

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

## CERTIFICATE OF SERVICE

I hereby certify that, on August 15, 2017, an electronic copy of this Motion of Defendant-Appellant for Bail Pending Appeal was filed with the Clerk of Court using the ECF system and thereby served upon the following counsel:

Brooke Elizabeth Cucinella
Margaret M. Garnett

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro